Page 1

            IN THE UNITED STATES DISTRICT COURT

               DISTRICT OF SOUTH CAROLINA

                    FLORENCE DIVISION


    DANIEL BARNETT,


                 Plaintiff,


           vs.        C/A NO. 4:23-cv-00294-JD-TER


    FLORENCE COUNTY, SOUTH CAROLINA, FLORENCE

    COUNTY SHERIFF'S OFFICE, FLORENCE COUNTY

    DETENTION CENTER, FLORENCE COUNTY SHERIFF

    T.J. JOYE, ANDERSON BEANE, SCOTT BROWN,

    DARRIN YARBOROUGH, CHRISTOPHER OWENS,

    CHASE MCDANIEL, AND BEN PRICE,

                 Defendants.




    DEPOSITION OF:  DANIEL BARNETT
    DATE:          July 8, 2024
    TIME:          9:53 a.m.
    LOCATION:      RICHARDSON, PLOWDEN & ROBINSON
                   2103 Farlow Street
                   Myrtle Beach, SC

    TAKEN BY:      Counsel for the Defendants
    REPORTED BY:   Lauren A. Balogh, RPR
    _____

Daniel Barnett

July 8, 2024

Barnett, Daniel v. Florence County, et al.

Page 49

County.

Q.   Okay.  Bad example.  How about Florence?

A.   I'm unaware of all of the specifics.  I know that other law enforcement activity would probably be in that mutual aid.

Q.   Were you ever activated under that mutual aid agreement to go assist in another jurisdiction?

A.   I don't recall.

Q.   Have you ever been employed by a law enforcement entity that had jurisdiction within Florence County?

A.   Again, I mean, outside of the mutual aid, I mean, you're a state certified officer.

Q.   Tell me what that means.

A.   As far as statewide?

Q.   Uh-huh.

A.   If you see a crime being committed, I mean, it's your duty and you've sworn to uphold the laws.

Q.   So you could -- if you are certified, let's say, in Darlington, you could wake up and decide, I'm going to go stop speeders in Cherokee County today?

Page 50

A.   No.

Q.   Okay.  So tell me -- I'm trying to understand how this works.

A.   I mean, if I happen to see a crime, it being a dangerous act happening, then, yes, I mean, I would act upon that.

Q.   How about not using a turn signal?

A.   No.

Q.   Or speeding?

A.   No.

Q.   Have you ever conducted traffic stops in Florence County?

A.   I have.

Q.   Okay.  What were the circumstances when that occurred?

A.   I recall one in Johnsonville.  The individual appeared that he was left of center and swerving off of the roadway.

Q.   Do you remember the date?

A.   I do not.

Q.   Once you -- well, how did you effect that traffic stop?

A.   What do you mean?

Q.   Were you in a law enforcement vehicle? Were you in your private vehicle?

Daniel Barnett    July 8, 2024
Barnett, Daniel v. Florence County, et al.

Page 51

A.   I was in a private vehicle, yes.

Q.   Okay.  How did you get the person to pull over?

A.   By using blue lights.

Q.   Why did you have blue lights in your private vehicle?

A.   Because I was a sworn police officer and during that time of any of those stops, I was in law enforcement.

Q.   Where were you -- where was your jurisdiction?

A.   Darlington County.

Q.   So you are in Johnsonville and you pull this person over using lights.  Did you use a siren?

A.   I did not.

Q.   Did you have a gun holstered to your belt?

A.   I did.

Q.   Were you wearing a badge?

A.   I was.

Q.   Tell me what happened when you stopped the --  well, first of all, do you remember the person's name?

A.   I do not.

4:23-cv-00294-JD    Date Filed 07/25/25    Entry Number 39-12    Page 5 of 14
Daniel Barnett                                           July 8, 2024
Barnett, Daniel v. Florence County, et al.

Page 52

Q.   Once you -- did you turn on the light and turn on the siren?

A.   Lights, yes.  Siren, no.

Q.   Okay.

A.   To my knowledge.

Q.   Was it a daytime or nighttime stop?

A.   It was at nighttime.

Q.   Did the person pull over?

A.   They did.

Q.   Where did they pull over?

A.   I don't recall the exact location that...

Q.   Okay.  What did you do when they pulled over?

A.   I called in the traffic stop to dispatch and let them know that I had an individual that was left of center, appeared to be intoxicated, and that I was conducting a 10-48.

Q.   Okay.  Did someone from Johnsonville come to the traffic stop?

A.   Did someone from Johnsonville?

Q.   Sure, in the jurisdiction.

A.   To my knowledge, it would have been my wife at the time.

Q.   Okay.  Let's back up.  Tell me what you

Page 53

mean by that.

A.    Mean by what?

Q.    You were out of your jurisdiction that you see this person driving left of center.  You stop them.  What do you do next?

A.    You call it into dispatch.

Q.    Okay.  And when you said that would have been my wife, was she working dispatch?

A.    No.

Q.    Okay.  Tell me what that means.

A.    She was in the passenger's seat.

Q.    Okay.  So did -- when you called it into dispatch, whose dispatch did you call it to?

A.    Darlington County.

Q.    Would Darlington have sent someone out to Johnsonville, or would they have contacted somebody else to come out to the traffic stop?

A.    I would assume they would contact someone else.

Q.    Okay.  Did you wait there until law enforcement arrived?

A.    I did not.

Q.    So explain that to me.  What did you do?

A.    Well, I approached the individual, made

Daniel Barnett

Barnett, Daniel v. Florence County, et al.

July 8, 2024

Page 54

sure that he was okay to be driving.  And other than that, I don't remember the specifics of what it was, but I ended up not smelling any alcohol or anything on their presence.

Q.   Did you detain that person?

A.   I did not.  I mean, if you consider a traffic stop detaining, then...

Q.   And it's your contention that you had authority to make that stop?

A.   Yes, ma'am.

Q.   Did that person ask you if he was under arrest?

A.   No, he did not.

Q.   So did you continue to have concerns about the person's ability after you talked to them?

A.   No, I did not.  I don't recall.

Q.   Did they ask you if you were in law enforcement?

A.   I don't recall if they did or not.

Q.   Any other traffic stops out of your jurisdiction you recall?

A.   I made one in my neighborhood.

Q.   Okay.  Tell me about that.

A.   Chase McDaniel and I were having a lot

of crime in our neighborhood.  He had gotten with me and said, hey, we need to try to combat this together.  And I arrived at home one evening and there was a vehicle parked down the street.  To my knowledge, kept putting their lights off and on and moving up to the next residence, and then they went down the street.  And weren't from that area.  They had a Georgia tag, so I ended up stopping the vehicle for being suspicious.  That was it.

Q.    Okay.  So tell me how you stopped that vehicle.

A.    I don't recall if I was in my personal or patrol vehicle.

Q.    Did you use lights and siren?

A.    I don't recall.  I mean, I would have used lights.

Q.    Did they stop?

A.    They did.

Q.    Were you in uniform?

A.    I had my weapon and badge on, to my knowledge.

Q.    Okay.  Tell me what happened during that traffic stop.

A.    I just made contact with them and seeing what they were doing in the area.  And that

Daniel Barnett                                July 8, 2024
Barnett, Daniel v. Florence County, et al.

Page 61

that he had contacted law enforcement and reported you as conducting traffic stops out of jurisdiction?

A.    I'm aware that they contacted them.

Q.    Okay.  Ever had any discussions with Mr. Stone about that?

A.    I have not.

Q.    How about Katelyn Campbell, you are currently married to Ms. Campbell?

A.    That's correct.

Q.    And when was your divorce final from Ashley Gibson?

A.    I don't recall the exact date.

Q.    And in fact, wasn't she granted divorce on the grounds of adultery?

A.    She was.

Q.    And can you tell me who is Victoria Kayla Mixon?

A.    That was a girl that I was dating.

Q.    While you were married --

A.    Correct.

Q.    -- to Ashley?

How about Jessica Walker Helms?

A.    That was, again, another female that I was dating during the time of my marriage.

Daniel Barnett                                              July 8, 2024
Barnett, Daniel v. Florence County, et al.

Page 73

heard.

Q.   Was he within earshot of everyone else?

A.   To be honest, I mean, again, I don't know who all was right there.  I just remember what was said to me by him and multiple M4s.  I was kind of in a shock, so I don't know.

Q.   Did you comply?

A.   I did.

Q.   What happened next?

A.   I was put in a patrol vehicle and taken to Florence County Detention Center.

Q.   Did you give the officers -- well, were you told that they had a search warrant for your home?

A.   I was told that, yes, but I never saw the warrant or anything prior to.

Q.   Did you give the officers the keys or the password to the security system?

A.   I gave them the passcode to get in my door, yes.

Q.   Okay.  Did the officers -- well, first of all, did you have a cellphone on you?

A.   I had a cellphone in my vehicle, yes.

Q.   Okay.  Was that cellphone taken?

A.   It was taken with the vehicle, yes.

A.    What do you mean?  As far as what type of information?

Q.    Acknowledging that they knew you were investigating members of the --

A.    I don't know if they were or not.  I mean, Mark might have told them.  That would be something you'd have to ask Florence County.

Q.    So your assertion that this entire operation was retribution, where does that come from?  What do you base that on?

A.    Well, I mean, I was targeted.

Q.    Okay.  Tell me about that.

A.    I was harassed by Mr. Beane all the time riding by my residence multiple occasions.  Several deputies on numerous occasions driving by my residence to try to intimidate.  And I understand it's a public roadway, but the only issue with that is even at this point to date, they still ride by for whatever reason and bonk their air horn or whatever, and that's been addressed with TJ.

Q.    Now, Mr. McDaniel lives in your neighborhood, correct?

A.    He does.

Q.    I'm assuming other deputies may come to

Barnett, Daniel v. Florence County, et al.

Page 123

Price?

A.   No, ma'am.

Q.   How about Chase McDaniel, anything that Chase did that caused damages to you?

A.   Not that I can think of right off.

Q.   And I don't think -- I asked you about Chris Owens, but I think you told me you were not aware?

A.   Not aware of?

Q.   Of what Chris Owens did that caused you any damages other than getting a warrant.

A.   I guess speaking to Katelyn or whatever conferred in there.  I don't know.

Q.   So you contend that when he was investigating this prior to getting a warrant, he shouldn't have spoken to Katelyn?

A.   I'm not saying that.

Q.   Okay.  What about Chase McDaniel?

A.   No.

Q.   And you're not contending that he intentionally destroyed your home or anything like that, are you?

A.   I mean, he was part -- I don't know what everybody's position was when they were in the home.

Daniel Barnett                                    July 8, 2024
Barnett, Daniel v. Florence County, et al.

Page 124

Q.    Okay.  And I'm specifically talking about the hole in the ceiling.  You're not contending he did that on purpose, are you?

A.    To my knowledge, I don't know.

Q.    Okay.

A.    I don't know what his...

Q.    How about Anderson Beane?

A.    What about him?

Q.    What did he do that caused you any damages?

A.    I mean, he put an M4 to my face and pushed me to the ground and continued -- I mean, harassed during that time.

Q.    Now, weren't all members of the SWAT team holding weapons?

A.    Again, I don't know who all was carrying what.  I would assume they had weapons, but, again, I don't know who was carrying what.

Q.    Okay.  And were you restrained?

A.    I was.

Q.    Handcuffed?

A.    I was.

Q.    Placed in a vehicle?

A.    I was.

Q.    Did you receive any type of injury

Daniel Barnett

July 8, 2024

Barnett, Daniel v. Florence County, et al.

Page 125

during your arrest?

A.    I did not.

Q.    So your complaint is that -- well, tell me how you were damaged.

A.    I mean, I went through depression. Extreme emotional trauma, distress.  Florence County still has out on their social media that I was arrested and that has not been changed.  Scott Brown testified they don't delete anything from their Facebook.

Do you want me to just go through the list of...

Q.    Absolutely.

A.    Okay.  Florence County is misleading in negative statements.  It's still being obviously out there to the public that charges weren't dismissed or anything of that nature.

Q.    Let me -- and I'm going to try not to cut you off.

A.    Sure.

Q.    But if I don't ask you a question when I think about it, I'll forget it because I'm that old.

A.    Okay.

Q.    It is true, in fact, that you were